[No. B168849. Second Dist., Div. Three. Dec. 30, 2004.]

CITY OF CARSON, Plaintiff and Appellant, v.
CITY OF LA MIRADA et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 1 of the Discussion.

534

## COUNSEL

Burke, Williams & Sorensen, Steven J. Dawson and Darren C. Kameya for Plaintiff and Appellant.

Stradling Yocca Carlson & Rauth, Douglas J. Evertz and Allison E. Burns for Defendants and Respondents.

## OPINION

**ALDRICH, J.—**

### INTRODUCTION

██ What is a "big box retailer" as used by the Legislature in Health and Safety Code section 33426.7 and Government Code section 53084? Commonly known as Assembly Bill No. 178 (Assem. Bill No. 178 (1999–2000 Reg. Sess.) §§ 3 & 2 (Bill No. 178), enacted by Stats. 1999, ch. 462, respectively), these statutes prohibit a redevelopment agency from providing financial assistance to a "big box retailer" that is relocating from one community to another within the same market area.[1]

---

[1] At the time of the events leading to this lawsuit, Bill No. 178 forbid financial assistance to a relocating big box retailer "unless the legislative body of the local agency [community] to which the relocation will occur offers the contract to the local agency [community] from which the relocation is occurring pursuant to this section." (Stats. 1999, ch. 462, §§ 2(a) & 3(a).) It is this version of the statute that governs this case.

In 2003, the Legislature amended the existing legislation to, among other things, eliminate the authority of a local agency or redevelopment agency to provide any form of financial assistance to a relocating vehicle dealer or big box retailer. (Stats. 2003, ch. 781, §§ 1 & 2.) Bill No. 178 now states: "Notwithstanding any other provision of this part, a redevelopment agency shall not provide any form of financial assistance to a vehicle dealer or big box retailer, or a business entity that sells or leases land to a vehicle dealer or big box retailer, that is relocating from the territorial jurisdiction of one community to the territorial jurisdiction of another community but within the same market area." (Health & Saf. Code, § 33426.7, subd. (a); see Gov. Code, § 53084, subd. (a) [identical language applied to local agencies].)

Plaintiff, City of Carson (Carson), appeals from the denial of its petition for writ of mandate. (Code Civ. Proc., § 1085.) Carson seeks to require the defendants, City of La Mirada, City Council of La Mirada, and the La Mirada Redevelopment Agency (together, La Mirada) to comply with the requirements of Bill No. 178 and share with Carson a portion of the sales tax revenue it receives from Corporate Express, Inc. (Corporate Express).

Bill No. 178 was enacted by the Legislature for the express purpose of preventing competition between municipalities for businesses that generate large amounts of retail sales tax. The definition of "big box retailer," contained in the statute, is based on two criteria only: physical size and ability to generate retail sales taxes under the Revenue and Taxation Code.[2] Based on the record, Corporate Express clearly falls within Bill No. 178's definition of "big box retailer," and the efforts of Corporate Express to exact an economic package from La Mirada to move to that city were exactly what Bill No. 178 was designed to prevent. Therefore, the trial court's interpretation and application of Bill No. 178 was legal error. Accordingly, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The parties.*

There is no dispute about the facts in this case. Carson is a municipality located in the South Bay area of Los Angeles County. La Mirada is located east of Carson. As with all municipalities in California, both cities rely upon sales tax revenue to fund local government and services.

### 2. *Corporate Express.*

The Southern California division of Corporate Express sells office products, furniture, and "computer consumable" supplies. Corporate Express's operations consist of 37 distribution centers throughout the United States. The company operates on a spoke-and-hub system. The hub is the distribution

---

[2] Bill No. 178 defines "big box retailer" as ". . . a store of greater than 75,000 square feet of gross buildable area that will generate sales or use tax pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law (Part 1.5 (commencing with Section 7200) of Division 2 of the Revenue and Taxation Code)." (Gov. Code, § 53084, subd. (b)(1); Health & Saf. Code, § 33426.7, subd. (b)(1).) The definitions in the Government Code and the Health and Safety Code cited here are identical except that the former statute applies to local agencies whereas the latter statute applies to redevelopment agencies.

Since its enactment in 1999, Bill No. 178 has been amended and renumbered. However, the definition of "big box retailer" has undergone no substantive change.

center, and spokes are sales, marketing, and customer service. In the greater Southern California area, Corporate Express sells its products from San Diego to Bakersfield, and east.

Corporate Express sells its products exclusively through a sales force. Corporate Express's customers are the end-users, not the retail sellers, of the products and are preferably businesses who have at least 35 white-collar workers. The company's direct competitors include Staples, Office Depot, and Boise Cascade. The company tailors its services to the customer's needs and volume. Hence, pricing is not standardized. Approximately 6,000 orders are processed per day, and some 99 percent of the orders are delivered by Corporate Express trucks.

Corporate Express does not accept orders from the general public. That is, the company's sales force solicits customers for whom they establish accounts. It is undisputed that Corporate Express services its customers by direct sales, purchase orders taken by telephone, facsimile, mail, and through the internet.

Corporate Express does not normally accept orders in person from its headquarters. Although its La Mirada facility contains a "will call" window where customers can pick up products, and a lobby with a receptionist to greet visitors, only employees with identification may enter the rest of the building, which is separated by security doors. Customers may only come to the "will call" window if they have existing accounts and have placed orders before arriving. The La Mirada site does not have cash registers.

The La Mirada facility contains a warehouse on the ground floor. The warehouse has 3.2 miles of conveyors, and loading docks on either side for shipping and receiving. There, the company receives products from manufacturers and selects individual items for sale to customers. The second floor, or mezzanine portion of the building, houses the administration and sales department. Forty-five employees work in the 60,000 square foot mezzanine. That area is a working showroom, where furniture is displayed while being used by the Corporate Express sales force. There is also a small display area where customers may browse and test the furniture and other products. According to Gary Gonsalves, president of Corporate Express's Southern California division, "quite often" clients are brought to the mezzanine to look at cubicle brands and furniture.

3. *Corporate Express's campaign to find a new location.*

Corporate Express maintained a sales and distribution facility in Carson from 1985 to 2002. As such, the company was one of the largest generators

of retail sales tax for Carson. This is a significant amount given that approximately 38.4 percent of Carson's general fund income for fiscal year 2001–2002 was derived from retail sales tax. The company held leases in Carson, Compton, and Paramount, all of which were set to expire in July 2002. After a merger between BT Office Products and Corporate Express in 1999, the latter wanted to consolidate its operations, and commenced a search for a new location. Later, Corporate Express acquired U.S. Office Products, which had a distribution center and headquarters in Santa Fe Springs.

In 2000, Corporate Express considered the possibility of expanding at its existing Carson site. But, it determined that the site was neither large enough nor the right shape to expand. Eventually, Corporate Express began looking outside Carson.

In the fall of 2000, Corporate Express contacted La Mirada to express its interest in consolidating its operations and relocating there. Corporate Express's October 12, 2000, letter to La Mirada's Director of Finance indicated that the company was looking for a 250,000 square foot distribution center. The company specified that it anticipated $221 million in sales for 2001 of which approximately $187 million would be taxable and $172.8 million would directly relate to Southern California. Corporate Express explained that one percent of this amount, or $1.728 million "in sales tax [is] collected from the *point of sale which is currently Carson.*" (Italics added.) More particularly, Corporate Express indicated that if it were to decide to relocate from Carson, it "would expect to reasonably partner with economic benefits gained by the City of La Mirada in a long term relationship as a result of $1.728 million in sales tax revenue for 2001 and approximately [$]1.9 million in the first full year in 2002."[3]

Concurrently, Corporate Express notified Carson that the company was seriously considering relocation concessions from La Mirada and Santa Fe Springs. The company reminded Carson *that all of its sales originate from its Carson facility, "as all of the orders are picked and shipped from this location."* (Italics added.) Corporate Express repeated its hope to "partner with economic benefits gained by the City of Carson in a long term relationship as a result of our sales tax base and employee count," and asked the Carson City Manager to provide the company "with specific program details and dollar amounts that would assist Corporate Express to continue its occupancy in the City of Carson versus relocating to La Mirada or Santa Fe Springs."

Carson's General Manager for Economic Development, Ronald E. Winkler, explained Carson's response to this request. Carson considered, inter alia,

---

[3] During trial in 2003, Corporate Express projected sales in excess of $250 million at its La Mirada location.

offering redevelopment tax increment money to the business, or a sales tax rebate. Carson understood itself to be in competition with La Mirada to offer assistance.

La Mirada was also eager to have Corporate Express move into that city and found a large parcel of land in an industrial area previously used as an oil refinery. The city preferred that Corporate Express be the tenant on this property, instead of a warehouse, which would not generate sales tax revenue. Originally, La Mirada had proposed offering Corporate Express a rebate of 50 percent of the sales tax. Ultimately, La Mirada increased the amount of the rebate to two-thirds of the sales tax revenue over a certain threshold amount for the first three years after its relocation; followed by 50 percent of the revenues in the following 12 years. Carson estimated that the total financial assistance given by La Mirada to Corporate Express would exceed $18 million over a 15-year period.

Carson offered to meet or exceed La Mirada's offer. By letter dated December 14, 2000, Carson offered two options: (1) a build-to-suit arrangement that Corporate Express would own, or (2) the retrofitting of an existing building under a lease agreement.

Unfortunately for Carson, two days earlier, on December 12, 2000, the La Mirada Redevelopment Agency and Corporate Express executed a participation agreement. Thereunder, La Mirada promised to assist Corporate Express in purchasing or leasing land and constructing a 250,000 square foot facility there. The agreement placed restrictions and maintenance requirements on Corporate Express, in return for which La Mirada would provide a financial incentive agreement for a period of 15 years. As the financial incentive, La Mirada agreed to refund to Corporate Express a percentage of tax revenues as long as the company's minimum annual sales tax revenues reached a certain amount. That is, the financial incentives would be measured by the production of sales tax revenues from the property.

La Mirada was also aware that Bill No. 178 might apply. Hence, included in the participation agreement was article 3.3, entitled "Possible Claim by the City of Carson." That article stipulated, in the event a court determined that Bill No. 178 applied to Corporate Express's relocation, that La Mirada would share its sales tax revenues with Carson and the financial incentive would be readjusted.

Corporate Express had completed its move to La Mirada by the time of trial.

### 4. *Carson's lawsuit.*

On April 6, 2001, Carson commenced the instant action against La Mirada to challenge the participation agreement as a violation Bill No. 178. After amendment, Carson's lawsuit sought (1) the invalidation of the participation agreement; (2) an injunction to regulate the approval of the participation agreement; and (3) writs of ordinary and (4) administrative mandate to enforce the revenue sharing provisions of Bill No. 178. By stipulation, the case was tried to the bench.

The trial court held that Bill No. 178 does not apply to Corporate Express's La Mirada facility because that company is not a "big box retailer." After considering the legislative history, testimony, and extrinsic evidence submitted by both parties, the court concluded that the phrase "big box retailer" and the word "store" had specific meanings attributed by the Legislature. They are: retail establishments selling to the general public (with or without membership dues), having very large parking lots (four to five parking spaces per 1,000 square feet of retail space), and catering to "auto-borne shoppers." Examples the trial court found repeatedly identified in the materials included Sam's Club, Home Base, Costco, Wal-Mart, and Office Depot.

Applying this definition to the evidence of Corporate Express's operations, the court concluded that the La Mirada facility "is not a large building located as an island amongst parking spaces." The court was influenced by the fact that Corporate Express did not accept orders from the general public. Rather, it is located in an area that is zoned heavy industrial, M-2, with 448 parking spaces for the 420 employees who work 24-hour days. Corporate Express does not have large signs or a large area where products are displayed to customers. The court found that "[t]he Legislature specifically limited the scope of its enactment to 'stores' " and that Corporate Express's La Mirada facility was "not operating a 'store' within the meaning of the statute . . . ." Rather, the Corporate Express La Mirada building was a "warehouse/distribution facility" because it had loading docks where trucks are filled for delivery to customers. The court entered judgment in favor of La Mirada and Carson filed its appeal.

## CONTENTION

Carson contends the trial court erred in ruling that Corporate Express is not a "big box retailer" within the meaning of Bill No. 178.

## DISCUSSION

1. *The trial court's denial of La Mirada's motion to dismiss the lawsuit was not error.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Corporate Express is a "big box retailer" as defined by Bill No. 178 and contemplated by the Legislature.*

a. *Corporate Express's physical size and ability to generate sales tax revenue make it a "big box retailer."*

The sole substantive question before us is whether Corporate Express qualifies as a "big box retailer" as that term is used in Bill No. 178, i.e., in Government Code section 53084, and Health and Safety Code section 33426.7.

■ In interpreting a statute, we apply long-established principles: " 'The fundamental rule . . . is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute " 'must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . .' " ' [Citations.]" (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 997 [109 Cal.Rptr.2d 454]; see *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) "Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 899 [276 Cal.Rptr. 918, 802 P.2d 420].)

■ Construction of a statute is a question of law which appellate courts review de novo. (*California Ins. Guarantee Assn. v. Liemsakul* (1987) 193 Cal.App.3d 433, 438 [238 Cal.Rptr. 346].)

■ Looking first to the words of Bill No. 178, it defines "big box retailer" as ". . . a *store* of greater than *75,000 square feet of gross buildable*

---

[*]See footnote, *ante,* page 532.

*area* that *will generate sales or use tax* pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law (Part 1.5 (commencing with Section 7200) of Division 2 of the Revenue and Taxation Code)." (Gov. Code, § 53084, subd. (b)(1); Health & Saf. Code, § 33426.7, subd. (b)(1), italics added.) Revenue and Taxation Code sections 7200 et seq. refer to the determination and computation of *sales and use tax*.[6] Bill No. 178 clearly and unambiguously defines "big box retailer" by two factors, namely, (1) physical size and (2) ability to generate sales tax.

The words of Bill No. 178 define Corporate Express's La Mirada facility. First, the building is far more than 75,000 square feet of gross buildable area. The mezzanine alone, where the sales are made, is 60,000 square feet. Second, Corporate Express generates retail sales tax revenue. By its own estimate, Corporate Express produced approximately $1.728 million "in sales tax collected from the point of sale" in 2000, and anticipated $1.9 million in 2002.[7] This amount made Corporate Express one of the largest producers of sales tax income for Carson. Indeed, Corporate Express marketed itself to Carson, La Mirada, and Santa Fe Springs on the basis of its capacity to produce significant amounts of sales tax income for these cities. It was this revenue-generating ability that compelled La Mirada to offer and then sweeten the deal with Corporate Express. Thus, the two elements of Bill No. 178's definition of "big box retailer" apply to Corporate Express.

 b. *Corporate Express's La Mirada facility is a "store."*

The parties dispute whether Corporate Express is a "store" as that word is used in Bill No. 178. Webster's Dictionary defines "store" as "a business establishment where usu[ally] diversified goods are kept for *retail* sale" (Webster's 9th New Collegiate Dict. (1983) p. 1162, italics added) and "a place of deposit for goods esp[ecially] in large quantities." (Webster's 3d New Internat. Dict. (1966) p. 2252.) Black's Law Dictionary defines "store"

---

[6] Section 7202 of the Revenue and Taxation Code provides that a "sales tax portion of any sales and use tax ordinance adopted under this part shall be imposed for the privilege of selling tangible personal property at retail, and shall include provisions in substance as follows: [¶] (a) A provision imposing a tax for the privilege of selling tangible personal property at retail upon every retailer in the county at the rate of 1 1/4 percent of the gross receipts of the retailer from the sale of all tangible personal property sold by that person at retail in the county."

[7] La Mirada's argument on appeal that "Corporate Express has no point of sale capability" is specious. In a letter to La Mirada in 2000, Corporate Express touted its $1.728 million "in sales tax collected from *the point of sale* which is currently Carson." Nor are we influenced by the argument that Corporate Express's facility is located in an industrial area without the amount of parking found near a Costco or Home Base store. Those factors are not relevant under the definition of "big box retailer" in Bill No. 178.

as "[a]ny place where goods *are deposited and sold* by one engaged in buying and selling them." (Black's Law Dict. (6th ed. 1990) p. 1420, italics added.)

Based on these definitions, Corporate Express is a store. The company buys large quantities of office and computer supplies and furniture, which products are kept in the warehouse and then repackaged and sold to customers. No one disputes that Corporate Express's customers are the end-users of the products the company sells. (See *Modern Paint & Body Supply, Inc. v. State Bd. of Equalization* (2001) 87 Cal.App.4th 703, 710 [104 Cal.Rptr.2d 784] [courts look to primary intent of purchaser in determining whether product purchased at retail or for resale].) Thus, regardless of the fact its customers are by account only and are businesses, Corporate Express's sales are *retail sales*. (See Rev. & Tax. Code, § 6007 ["A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property"].) The company's building contains a showroom and display area. Its competitors are Staples, Office Depot, and others who are in the business of retail sale of office supplies. Although the warehouse and mezzanine are not customer-friendly atmospheres, the La Mirada building is where the company *sells* its products to the ultimate consumer.

We are not persuaded by La Mirada's argument that Corporate Express's La Mirada facility is really a warehouse, not a store. La Mirada describes Corporate Express's facility as a "highly mechanized warehouse-distribution facility, with large stacks of products, fork lift trucks moving through aisles, and conveyor tracks to move products in bulk from shelves to trucks for shipping." Apart from the obvious fact that the definitions of store include the *deposit of goods as well as their sale*, the relevant factor in Bill No. 178 is the *generation of sales tax*. Hence, the facility can be both warehouse and store and still fall within the meaning of "big box retailer."[8] While a large portion of Corporate Express's La Mirada facility warehouses its products, the building is also, by Corporate Express's own admission, a place where goods are sold. (Cf. Rev. & Tax. Code, § 7205 ["retail sales are consummated at the place of business of the retailer"].) In fact, La Mirada admits Corporate Express's "operations . . . generat[e] . . . sales tax." Other than physical size, that is how the statutes define "big box *retailer*." (Gov. Code, § 53084, subd. (b)(1); Health & Saf. Code, § 33426.7, subd. (b)(1).) In any event, La Mirada has always been fully aware of the likelihood that Corporate Express would fit within the statutes' definition of "big box retailer." It chose to

---

[8] La Mirada's characterization of Corporate Express as "hostile to would-be shoppers" is disingenuous because the company's own President testified Corporate Express seeks Fortune 500 customers, and "quite often" brings in customers to its facility's mezzanine to look at and test products.

attract Corporate Express rather than a warehouse exactly because Corporate Express generated sales tax, and then it included in the participation agreement the article 3.3 contingencies in case Carson brought suit to enforce its rights under Bill No. 178. Corporate Express is a store.

c. *Competition among municipalities is exactly the evil Bill No. 178 was designed to prevent.*

Our interpretation is consistent with the express intention of the Legislature. (*Klajic v. Castaic Lake Water Agency, supra*, 90 Cal.App.4th at p. 997.) Bill No. 178 was enacted in response to a statewide fiscal crisis and resulting battle for sales tax revenue. In the face of a severe budget crisis in fiscal years from 1992 to 1994, the state began "shifting" local property tax dollars to meet state obligations. This shifting "exacerbated the already crumbling state/local fiscal relationship and forced local governments into fierce competition with each other over business developments that generate sales tax." (Assem. Com. on Housing & Community Development, analysis of Assem. Bill No. 178 (1999–2000 Reg. Sess.) as amended May 3, 1999.) As the Assembly's Committee on Housing and Community Development observed, "[b]ig box retailers began to hold bidding wars between local governments to determine which could provide the greatest subsidy for the business' location. These bidding wars have become particularly damaging when a business threatens to relocate to a nearby city if the current municipality fails to come up with an incentive package for it to stay."[9] (See also Sen. Local Gov. Com., analysis of Assem. Bill No. 178 (1999–2000 Reg. Sess.) as amended July 12, 1999.) While the bill was amended during the legislative process, the legislative goal remained constant and the bill enjoyed wide-ranging support both in the Legislature and from organizations ranging from California Business Properties Association to the Sierra Club.

The unambiguous manifestation of the Legislature's intent concerning the purpose of Bill No. 178 is found in its ensuing uncodified preamble, which states, "The Legislature finds and declares that *the provision of financial assistance by local agencies to automobile dealerships and big box retailers* that seek to obtain public funds from local agencies as subsidies for their relocation, *results in the loss of public funds available for public purposes*, impedes the implementation of good planning, *encourages unfair competition*

---

[9] Assembly Member Torlakson cited an example. The Ventura city officials agreed to give away all of the increases in sales tax revenue generated over a 15-year period by shopping mall anchors lured from nearby Oxnard. The revenue was used, not for public resources for activities that enhanced the region's economic activities, or to create jobs, but to give to a developer who bankrolled a parking garage and a series of road improvements to move two stores three miles. Torlakson wanted to "ensure that local governments have the broadest flexibility to fund services for taxpayers and that public resources are not given away to extremely profitable retail giants."

*between local agencies,* and does not result in a public benefit to the people of the state. [¶] (b) The Legislature further finds and declares that *limiting this competition for sales tax revenues is an issue of statewide concern* and therefore it is necessary to apply the provisions of this act to all cities and counties in the state." (Stats. 1999, ch. 462, § 1, italics added.)

Looking to the goals of the statutes, as explained by Bill No. 178's author, Assembly Member Torlakson, "[t]here are many examples of the divisive competition that pits cash-strapped local governments against each other to attract, at the public's expense, 'big box' retailers. We should ensure that local governments have the broadest flexibility to fund services for taxpayers and that public resources are not thrown away to extremely profitable retail giants." Torlakson explained that the revenue sharing was limited to auto dealers and "big box retailers" because "they generate large amounts of sales taxes to city general funds and are the businesses that have been playing off cities against each other. [These two types of businesses] are often 'stand alone' businesses—that is not part of some larger development project—which is why they can negotiate in this manner. [¶] Often auto dealers and big box retailers negotiate for assistance, which is a percentage of the sales tax they will generate—not on the basis of real economic needs."

Bill No. 178 must be interpreted to promote the legislative intent and to " 'effectuate the purpose of the law.' " (*Klajic v. Castaic Lake Water Agency, supra,* 90 Cal.App.4th at p. 997.) "[T]he object which a statute seeks to achieve and the evil which it seeks to prevent are of prime consideration in the statute's interpretation [citation] . . . ." (*Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564].) With the enactment of Bill No. 178, the Legislature targeted a problem of "statewide concern," namely, the predatory competition among municipalities for sales tax revenue and the resulting squandering of public money spent to lure large revenue-producing stores away from neighboring municipalities. Bill No. 178 targeted auto dealers and "big box retailers" expressly because they generate large amounts of sales taxes for municipalities' general funds.

The fiscal policy ill that Bill No. 178 was designed to cure is exactly the malady that occurred in this case. Corporate Express played Carson, La Mirada, and Santa Fe Springs against each other in an effort to secure the best financial incentive package possible. The effect was to deprive Carson of critical general fund money for public services, while La Mirada depleted its public funds to confer a subsidy on a private business in the estimated amount of $18 million over a 15-year period.

Given our interpretation of the statutes, the trial court erred in ruling that Corporate Express was not a "big box retailer" under Bill No. 178. The trial

court used enterprises such as Costco, Sam's Club, Home Base, and other giant retail chains as the model for its definition of "big box retailer." To support its position that the Legislature only had these name-brand stores in mind when it considered Corporate Express, the trial court cited as evidence, among other things, newspaper articles from such sources as the Los Angeles Times and the Sacramento Bee, and book chapters found in the legislative materials submitted by the parties. However, because the legislative intent is clear and the words of the statutes are unambiguous, the trial court was not required to reach out to other sources.

The court characterized "big box retailer" as a retail store that requires large parking lots, huge pylon signs, and that "caters to auto borne shoppers." Yet, there is no mention in Bill No. 178 of parking, signage, zoning, or the manner in which shoppers make their purchases. The trial court's reliance on physical characteristics ignores the stated goal of the Legislature in enacting Bill No. 178, namely, to remedy a problem of *fiscal policy and economic incentives*, not zoning or blight.

Any focus on the so-called brick and mortar definition of "big box retailer" overlooks the fact that sales are increasingly being made by telephone, facsimile, and the internet.[10] Such trade has been generating sales tax revenue for Corporate Express for years. Ignoring sales that occur by telephone, facsimile, or through the internet, renders surplusage the reference in the statutes' definition to the ability to generate sales and use tax.

Finally, we reject La Mirada's argument that Bill No. 178 does not apply to Corporate Express because that company did not "relocate" from Carson to La Mirada. La Mirada quotes from the statute's definition of "relocating" as "the closing of [a] . . . big box retailer in one location and the opening of [a] . . . big box retailer in another location within a 365-day period . . . ." where there is a unity of ownership between the closing and opening retailers. (Gov. Code, § 53084, subd. (b)(5); Health & Saf. Code, § 33426.7, subd. (b)(5).) La Mirada argues that Corporate Express consolidated its operations by closing four locations and consolidating them in La Mirada, with the result it did not "relocate" so much as consolidate. Semantics aside, what occurred in this case was a relocation. There is a unity of ownership, here, as all four locations were Corporate Express facilities. Also, the portion of Corporate Express's facility containing the point of sale capability to "generate sales tax" revenue was originally in Carson and *relocated* to La Mirada.

■ To summarize, Corporate Express is a "big box retailer" as that term is defined in Bill No. 178. Its La Mirada facility is larger than 75,000 square

---

[10] Carson's expert, Glenn Desmond, testified that these days businesses are evolving towards electronic purchases and so there is no requirement that there be a cash register at the location for it to be deemed a store.

feet of gross buildable area and generates sales tax pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law. (Gov. Code, § 53084, subd. (b)(1); Health & Saf. Code, § 33426.7, subd. (b)(1).) Therefore, the trial court erred in denying Carson's writ petition.

## DISPOSITION

The judgment is reversed. Respondent to pay costs on appeal.

Klein, P. J., and Croskey, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 23, 2005.